IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| HELENA HUNTERS & ANGLERS ASSOCIATION, et al., | CV 22–126–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| RANDY MOORE, et al., | |
| Defendants. | |

In this case, environmental Plaintiffs Helena Hunters and Anglers Association, Western Watersheds Project, Sierra Club, and WildEarth Guardians (collectively "Plaintiffs") challenge the United States Forest Service's ("USFS") decision to remove big game standards from the Helena-Lewis and Clark National Forest Plan (the "2021 Land Management Plan" or the "Plan"), as well as aspects of the United States Fish and Wildlife Service's ("FWS") biological opinion on grizzly bears completed in preparation for that decision. Plaintiffs allege that the Plan violates the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedure Act ("APA"). Pending are (1) Plaintiffs' motion for summary judgment, (Doc. 17); (2) the USFS's and FWS's (collectively "Federal Defendants") cross-motion for summary judgment, (Doc. 22); and (3) Federal Defendants' motion to strike, (Doc. 20). For the reasons

1

stated herein, Plaintiffs' motion for summary judgment is denied and Federal

Defendants' motions for summary judgment and to strike are granted.

BACKGROUND[1]

## I.   Helena-Lewis and Clark National Forest and the Grizzly Bear

The Helena-Lewis and Clark National Forest (the "Forest"), located in

central Montana, FWS-000347, is occupied by, among other species, the grizzly

bear. *See* FWS-000360–61. Historically, grizzly bears lived throughout much of

western North America with populations as high as 50,000 bears. FWS-001911.

By the time the grizzly bear was listed as threatened under the ESA in 1975, they

had been reduced to less than two percent of their historic range. FWS-0001912–

13. Grizzly bears remain listed as a threatened species under the ESA, though no

critical habitat has been designated. FS-120409.

Grizzly bears range through a variety of habitats and their daily movements

are largely driven by "the search for food, water, mates, cover, security, or den

sites." FWS-001904. "The available habitat for grizzly bears is also influenced by

people and their activities." FWS-001904. "Human activities are the primary

factor impacting habitat security and the ability of bears to find and access foods,

---

[1] This case involves two administrative records: the USFS administrative record, cited as "FS-[bates page #]", and the FWS administrative record, cited as "FWS-[bates page #]." All facts are undisputed unless otherwise indicated. (*See* Docs. 19, 24, 25, 29.)

mates, cover, and den sites." FWS-001904. "[M]anaging human access to grizzly

bear habitat" is thus the "key to effective habitat management." FWS-001968.

For grizzly bear populations to recover in the lower 48 states, the species needs

large blocks of land, cover, high-caloric foods, and dens. FWS-001957. Grizzly

bears also need to maintain genetic diversity and have connectivity restored

between subpopulations. FWS-001917. Grizzly bears need a sufficient number

and distribution of ecosystems with ecological and genetic diversity across their

range as well. FWS-001917.

## II.    2021 Land Management Plan

"Forest plans govern the management of national forests, and the National

Forest Management Act [NFMA] requires revision of Forest Plans at least every

fifteen years." *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 861 (D. Mont.

2021) (citing 16 U.S.C. § 1604(f)(5)(A)) (internal record citation omitted). At

issue in this case is the Forest's 2021 Land Management Plan. FS-227569–8222.

The USFS opened scoping in the form of a draft forest plan in the winter of 2016,

FS-00228310, issued a Draft Environmental Impact Statement ("EIS") in June

2018, FS-00205201, and issued a Final EIS and Record of Decision on October 29,

2021, FS-00227549.

The purpose of the Plan "is to have an integrated set of plan direction . . . to

provide for social, economic, and ecological sustainability and multiple uses of

3

the" Forest's lands and resources.  FS-00228316.  "It does not authorize, fund, or

carry out an action but provides direction for future actions that may be authorized,

funded, or carried out by the Forest."  FWS-000007.  However, it does "provide[]

an integrated plan for land and resource management, which articulates desired

conditions, goals, objectives, standards, guidelines, and suitability of lands."

FWS-000006–07.  Importantly,

> [a] standard (STD) is a mandatory constraint on project and activity
> decision-making, established to help achieve or maintain one or more
> desired conditions, to avoid or mitigate undesirable effects, or to meet
> applicable legal requirements. Standards must be met and cannot be
> deviated from. A guideline (GDL) is a constraint on project and activity
> decision-making that allows for departure from its terms, so long as the
> purpose of the guideline is met. Guidelines are established to help
> achieve or maintain one or more desired conditions, to avoid or mitigate
> undesirable effects, or to meet applicable legal requirements.

FWS-000007 (internal citations omitted).

The primary dispute in this case concerns the Plan's omission of ten wildlife

standards (the "Wildlife Standards") that were present in the previous Land

Management Plan for the Helena National Forest (the "1986 Plan").  Included in

the Wildlife and Fisheries section of the 1986 Plan and listed under the header

"Big Game," the Wildlife Standards covered various ways to protect big game,

including the following regarding cover and motorized vehicle management:

> 1. On important summer . . . and winter range, adequate thermal and
> hiding cover will be maintained to support the habitat potential.

4

2. An environmental analysis for project work will include a cover analysis. The cover analysis should be done on a drainage or elk herd unit basis. . . .

3. Subject to hydrologic and other resource constraints, elk summer range will be maintained at 35 percent or greater hiding cover and areas of winter range will be maintained at 25 percent or greater thermal cover in drainages or elk herd units.

4. Implement an aggressive road management program to maintain or improve big security.

To decide which roads, trails, and areas should be restricted and opened, the Forest will use the following guidelines developed with the Montana Department of Fish, Wildlife[] and Parks (MDFWP). The Forest visitor map will document the road management program.

> a. Road management will be implemented to at least maintain big game habitat capability and bunting opportunity. To provide for a first week bull elk harvest that does not exceed 40 percent of the total bull harvest, roads will be managed during the general big game hunting season to maintain open road densities with the following limits.

> [Limits Omitted]

> The existing hiding cover to open road density ratio should he [sic] determined over a large geographic area, such as timber sale analysis area, a third order drainage, or elk herd unit.

> b. Elk calving grounds and nursery areas will be closed to motorized vehicles during peak use by elk. Calving is usually in late May through mid-June and nursery areas are used in late June through July.

> c. All winter range areas will be closed to vehicles between December 1 and May 15. Exceptions . . . may be granted.

> d. At restricted roads, trails, and areas, signs will be posted which tell:

5

    1. Type of restriction.
    2. Reason for restriction.
    3. Time of restriction.
    4. Cooperating agencies.

e. Roads that will be closed will be signed during construction or reconstruction telling the closure date and reason for closure.

f. Enforcement is a shared responsibility. Enforcement will be coordinated with the MDFWP.

g. Opened Forest roads will normally have designed speed of less than 15 miles per hour. Exact design speeds will be determined through project planning. Loop roads are no recommended and will be avoided in most cases.

h. The Forest Road Management Program will be developed in conjunction with MDFWP and interested groups or individuals. The Road Management Program will contain the specific seasonal and yearlong road, trail, and area restrictions and will be based on the goals and objectives of the management areas in Chapter III of the Forest Plan.

i. Representatives from the Helena Forest and MDFWP will meet annually to review the existing Travel Plan.

5. On elk summer range the minimum size area for hiding cover will be 40 acres and the minimum size area on winter range for thermal cover will be 15 acres.

FS-00170225–27. Wildlife Standards 6 through 10 provide further protections for elk, sheep, and other big game. FS-00170227. Also relevant here, the Lewis and Clark National Forest had a 1986 Land Management Plan; that plan did not include these standards.

While the 2021 Plan omits these Wildlife Standards, it incorporates direction from the 2018 Forest Plan Amendments to Incorporate Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population ("2018 Grizzly Bear Amendments"). *See* FS-00227990 (2021 Land Management Plan); FS-00228707 (EIS). Relevantly, the 2018 Grizzly Bear Amendments "[r]estrict[] vegetation management activities . . . to reduce the potential for disturbance or displacement of grizzly bears." FS-00227990. The 2018 Grizzly Bear Amendments also identify management zones that apply varying levels of protections to certain areas. *See, e.g.*, FS-00108865. They do not cover the entire Forest. For example, an area within the Forest known as the Divide Landscape is within both Management Zone 2, for which the 2018 Grizzly Bear Amendments do not apply, and also within Management Zone 1, for which they do. *See* FWS-000366–68.

## III. Procedural History

Plaintiffs filed suit on July 19, 2022, raising five claims and seeking an order declaring the USFS and the FWS violated the ESA and NEPA, vacating portions of the 2021 Land Management Plan and the FWS's biological opinion ("BiOp"), and remanding the matter back to the agencies. (Doc. 1.) On April 3, 2023, Plaintiffs filed an amended complaint, simplifying their claims, settling on three causes of action: (1) the USFS's and the FWS's failure to properly consider the

7

alleged removal of the Wildlife Standards violates the ESA; (2) the USFS's failure to analyze the direct, indirect, and cumulative effects of removing the Wildlife Standards violates NEPA; and (3) the USFS's failure to consider a reasonable range of alternatives in the Plan violates NEPA. (Doc. 15 at ¶¶ 105–24.) Plaintiffs' ultimate request for relief remains largely the same. (*Compare* Doc. 1 at 45 *with* Doc. 15 at 41–42.)

## LEGAL STANDARD

Judicial review of agency actions under NEPA, NFMA, and the ESA is governed by the APA. 5 U.S.C. §§ 706, *et seq.*; *see San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The review is deferential to the agency, and a court should "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A decision is arbitrary and capricious only "if the agency has relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Id.* An

agency's action is valid if the agency considered the relevant factors and

articulated "a rational connection between the facts found and the choice made."

*Id.* (internal quotation marks omitted). Consistent with the court's obligation not

to substitute its judgment for that of the agency, an agency's action may only be

upheld on "the basis articulated by the agency itself," and the agency must make

plain its course of inquiry, analysis, and reasoning. *Id.* at 50.

**ANALYSIS**

"[T]he Secretary shall develop, maintain, and, as appropriate, revise land

and resource management plans for units of the National Forest System." 16

U.S.C. § 1604(a). Forest plans are to "be revised . . . from time to time . . . but at

least every fifteen years." *Id.* § 1604(f)(5)(A). As an initial matter, a legal

determination is needed on the question of whether the 2021 Land Management

Plan is a new land management plan for the Helena-Lewis and Clark National

Forest or if it is a revision to the 1986 Plan. Plaintiffs argue it is a revision while

Federal Defendants counter it is a new plan entirely. Ultimately, Plaintiffs have

the better argument.

The USFS notes that the 1986 Plan is more than 30 years old and, as such, is

"not responsive to the needs of local communities and the relevant land

management challenges for the area." FS-00230782–83. Additionally, the USFS

identifies the 2021 Plan as a "revision" throughout the record. FS-00228310

(explaining in the EIS summary that "[p]art of implementing the consolidation [of

the Helena and the Lewis and Clark National Forests] included a combined forest

plan *revision* effort, which includes the preparation of this [FEIS]" (emphasis

added)); FS-00230783 (noting "the need for change supporting this plan *revision*"

and "the plan *revision* addresses the following topics" (emphasis added)). The

FWS also considers the Plan a revision. *See* FWS-000346 (noting that the

"[Helena-Lewis and Clark National Forest] is proposing to *revise* its land and

resource management plan" in the Biological Assessment for the project (emphasis

added)).

Notwithstanding the parties' disagreement over whether the 2021 Land

Management Plan is a revision or a new plan, the USFS must follow the same

procedures under NEPA if the agency is revising a forest plan or creating a new

one. *See Colo. Off Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130,

1131 (10th Cir. 2004). Thus, although the Plan is a revision, the legal importance

of that distinction is not material to this dispute.

With that distinction out of the way, Plaintiffs' one ESA and two NEPA

claims are considered in turn. Plaintiffs generally argue that the agencies' failure

to adequately consider the Wildlife Standards in the 2021 Land Management Plan

violates both the ESA and NEPA. Because they are incorrect as to each, summary

10

judgment is granted in favor of Federal Defendants.  Federal Defendants also move

to strike portions of the declarations provided by Plaintiffs in support of their

motion for summary judgment.  Because those portions are improperly submitted,

Federal Defendants' motion to strike is granted.

## I.      The ESA (Claim 1)

"When it comes to protecting listed species, environmental context is

critical."  *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir.

2022).  "The ESA obligates federal agencies 'to afford first priority to the declared

national policy of saving endangered species.'"  *Pac. Coast Fed'n of Fishermen's*

*Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084–85 (9th Cir. 2005)

(quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)).  When a proposed

agency action may affect a species protected by the ESA, the agency must consult

with either the FWS or the National Marine Fisheries Service.  *See* 16 U.S.C.

§ 1536(a)(2).

Where the proposed action is "likely to adversely affect" listed species or

critical habitat, the agencies must engage in formal consultation.  50 C.F.R.

§ 402.14.  Such consultation results in the issuance of a biological opinion by the

consulting agency—here, the FWS.  *Id.* § 402.14(h).  In that document, the FWS

must make a "jeopardy" determination, i.e., determine whether the proposed action

is "likely to jeopardize the continued existence of any endangered species or

threatened species." 16 U.S.C. § 1536(a)(2).  In addition to the jeopardy

determination, "[t]he biological opinion shall include: (i) [a] summary of the

information on which the opinion is based; (ii) [a] detailed discussion of the

environmental baseline of the listed species . . . ; [and] (iii) [a] detailed discussion

of the effects of the action on listed species." 50 C.F.R. § 402.14(h)(1).  The

USFS's reliance on a deficient biological opinion violates the ESA. *Ctr. For

Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th

Cir. 2012).

Plaintiffs assert the FWS violated the ESA for three reasons: (1) it failed to

include the Wildlife Standards in the environmental baseline analysis; (2) it failed

to include the removal of the Wildlife Standards in the effects of the action

analysis; and (3) its no jeopardy finding was premised on incorrect assumptions.

Each argument lacks merit.

### A.    Environmental Baseline

As part of the FWS's consultation obligation, the agency must "[e]valuate

the current status and environmental baseline of the listed species or critical

habitat." 50 C.F.R. § 402.14(g)(2).  The environmental baseline "refers to the

condition of the listed species . . . without the consequences . . . caused by the

proposed action." *Id.* § 402.02.  It "includes the past and present impacts of all

Federal, State, or private actions and other human activities in the action area." *Id.*

The FWS, using information provided at least in part by the USFS, "shall use the best scientific and commercial data available" in determining the environmental baseline.  16 U.S.C. § 1536(a)(2).  The FWS's jeopardy analysis may not take place "in a vacuum."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008).

Here, Plaintiffs argue that the FWS violated the ESA by failing to include the Wildlife Standards and their purported habitat benefits in the grizzly bear environmental baseline.  Federal Defendants argue that while the FWS did not explicitly reference how the Wildlife Standards benefit or harm grizzly bears, it did generally consider how those standards impact the species.  Thus, the pertinent question is whether the FWS needed to explicitly reference the Wildlife Standards or whether it could analyze the content of the Wildlife Standards without mentioning each one by name.  Because it was under no obligation to be more specific, Federal Defendants are correct.

In the BiOp, the FWS declares that it analyzed the effects "the existing condition (the existing Forest Plans)" had on grizzly bears.  FWS-000009.  Additionally, the BiOp also notes that the "existing plans also include standards for maintaining hiding cover to benefit big game and other species."  FWS-000021.  The BiOp captures the Wildlife Standards' protective effects without explicitly mentioning how it did so.  For example, Wildlife Standard number four requires

13

the Forest to "[i]mplement an aggressive road management program to maintain to improve big game security." *See* FS-00170225. The BiOp analyzes in great detail how roads factor into the environmental baseline. FWS-000010–19. Thus, although it did not specifically discuss how the Wildlife Standards—which explicitly reference big game only—impact the environmental baseline for grizzly bears, the FWS did create a "snapshot" of the grizzly bear health at the time of the creation of the Plan. *See* FWS-005063 (ESA Section 7 Consultation Handbook).

### B.    Effects of the Action

Another aspect of the FWS's consultation obligation is to consider the effects of the proposed action. ESA regulations define the "effects of the action" as follows:

> all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.

50 C.F.R. § 402.02. Importantly, the environmental baseline and the effects analysis are "distinct." *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1226 (D. Mont. 2010).

Plaintiffs argue that the FWS ignored the USFS's removal of the Wildlife Standards from the Plan when analyzing the effects of the action, violating the

14

ESA.  Federal Defendants argue that the USFS did not remove the Wildlife

Standards at all, and even if they did, the FWS provided detailed analysis regarding

how the Plan would impact grizzly bears.  While Federal Defendants are incorrect

as to the first argument, they are ultimately correct because the FWS complied

with its obligation under the ESA by analyzing the effects of the action on grizzly

bears.

Federal Defendants first argue that the Wildlife Standards were not

eliminated but rather reincorporated into the Plan as guidelines and desired

conditions.  It is undisputed that the Wildlife Standards in the 1986 Plan required

specific thermal and hiding covers and access management restrictions, *see* FS-

00170225–27, and that the 2021 Land Management Plan does not include these

standards.  In fact, the Wildlife and Fisheries section of the Plan includes no

standards at all.  *See* FS-227690–91.  While there is some overlap between the

Wildlife Standards and the guidelines and desired conditions in the 2021 Land

Management Plan, Federal Defendants fail to show how each Wildlife Standard is

maintained.  *Compare* FS-00227690–91 (2021 Plan) *with* FS-00170225–27 (1986

Plan).

Notwithstanding the overlap of similar topic areas between the standards in

the 1986 Plan and the conditions and guidelines in the revised Plan, Federal

Defendants contend that standards and desired conditions or guidelines are equally

15

effective because they are both "likely enforceable under the ESA." (Doc. 23 at 32

n.8 (citing *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d

1031, 1045–47 (9th Cir. 2015).) While that may be so, it does not mean that they

have the same strength or impact. As explained above, a standard is a "mandatory

constraint on project and activity decision-making [and] . . . must be met and

cannot be deviated from." FWS-000007. A guideline, on the other hand, "is a

constraint on project and activity decision-making that allows for departure from

its terms, so long as the purpose of the guideline is met." FWS-000007. By their

own terms, the definition of each requirement demands a different level of

compliance. Thus, the Wildlife Standards are not "largely carried forward in the

2021 Forest Plan." (Doc. 23 at 31.)

However, Federal Defendants are correct as to their second point. The FWS

adequately considered the effects on grizzly bears in the BiOp. *See* FWS-000034–

69. Specifically, the agency discussed the general effects of motorized access,

winter motorized access, and non-motorized access on grizzly bears. *See* FWS-

000038–54. It also analyzed food and attractants, *see* FWS-000054–56, livestock

grazing, *see* FWS-000056–58, vegetation and fire management, *see* FWS-000058–

62, and energy mining and development, *see* FWS-000062–63. In the vegetation

and fire management section, the FWS considered long-term effects related to bear

16

cover and forage, specifically how they would be impacted depending on what types of projects occur over the lifecycle of the Plan.  FWS-000058.

Plaintiffs argue that because ESA regulations define the effects as "consequences . . . [that] would not occur *but for* the proposed action and [are] reasonably certain to occur," 50 C.F.R. § 402.02 (emphasis added), the FWS needed to provide a detailed analysis of the effects of removing the Wildlife Standards on the bears.  That is not so.  The FWS's "responsibilities during formal consultation" include evaluating the environmental baseline, *id.* § 402.14(g)(2), evaluating the effects and cumulative effects, *id.* § 402.14(g)(3), and adding them together to make a jeopardy determination, *id.* § 402.14(g)(4).  The Wildlife Standards need not be analyzed in both areas so long as they are incorporated somewhere in the consultation process.

Plaintiffs concede that "[n]o one is arguing the agency must compare and contrast the old plan against the revised plan in the biological opinion." (Doc. 28 at 15.)  In practice, however, that is what Plaintiffs ask for here.  It is not a court's responsibility to dictate where nor how the removal of the Wildlife Standards should be analyzed, so long as the environmental baseline and the effects of the action are both adequately considered.  *See* 50 C.F.R. § 402.14(g).  And ultimately, the FWS's analysis of these factors was sufficient.

### C.    Jeopardy

As mentioned above, Section 7 of the ESA requires the USFS to consult with the FWS to ensure a proposed agency action will not jeopardize the continued existence of the grizzly bear.  16 U.S.C. § 1536(a)(2).  To "jeopardize the continued existence of" a species means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by *reducing the reproduction*, numbers, or distribution of that species."  50 C.F.R. § 402.02 (emphasis added).  "Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act."  *Id.*  Jeopardy findings cannot occur "in a vacuum," or else "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest."  *Nat'l Wildlife Fed'n*, 524 F.3d at 929–30.  Plaintiffs argue that the FWS incorrectly assumed that the Wildlife Standards were completely carried forward to the revised Plan when it made its "no jeopardy" finding, violating the ESA.  Federal Defendants counter that they made no such assumption.  Instead, they argue that the FWS considered the revised Plan with the understanding that the Wildlife Standards no longer existed.  In mischaracterizing the record, Plaintiffs miss the mark and Federal Defendants are correct.

Plaintiffs posit that the BiOp erroneously incorporated each Wildlife Standard into the 2021 Land Management Plan based on the assumption that the effects would be the same as when the Wildlife Standards were in effect. However, the agencies adequately considered the baseline and analyzed the Plan's effects on grizzly bears, as discussed above.  The record does not support Plaintiffs' assertion that the USFS or the FWS made any assumption that nothing was changing from the 1986 Plan.  On the contrary, Federal Defendants acknowledge that the Wildlife Standards have been removed and were replaced by other guidelines, standards, and desired conditions.  Plaintiffs are correct that "[t]he agency certainly has the discretion to make these changes" but Plaintiffs are not correct that it must "account for how [the removal of the Wildlife Standards] affect[s] grizzly bears." (Doc. 28 at 17.)  The FWS merely needs to show how the Plan as a whole, impacts grizzly bears.  If Plaintiffs had been able to demonstrate that the Wildlife Standards were promulgated to protect grizzly bears, they would have had a stronger argument, but the record does not support that conclusion either.  Thus, because the record reflect that the agency was not operating under this incorrect assumption, the jeopardy determination was not arbitrary and capricious.

## II.   NEPA Claims

NEPA sets procedural requirements for federal agencies to follow when contemplating actions that will have an impact on the environment.  42 U.S.C. § 4332.  "NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)).  Consequently, agencies must consider alternatives to the proposed action—including no action—and compare the environmental consequences of those alternatives against the proposed action.  40 C.F.R. § 1502.14.

NEPA requires the government to prepare an EIS for any proposed federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "The EIS must address, among other things, 'the environmental impact of the proposed action' and 'any adverse environmental effects which cannot be avoided should the proposal be implemented.'"  *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (quoting 42 U.S.C. § 4332(2)(C)(i)–(ii)).

Plaintiffs argue that the USFS violated NEPA in two ways: first, by failing to analyze the effects of removing the Wildlife Standards on grizzly bears and

20

second, by failing to consider and evaluate a reasonable range of alternatives.
Plaintiffs are incorrect.

A.     **Effects Analysis (Claim 2)**

An EIS must address "reasonably foreseeable environmental effects of the
proposed agency action" and "any reasonably foreseeable adverse environmental
effects which cannot be avoided should the proposal be implemented." 42 U.S.C.
§ 4332(2)(C)(i)–(ii). Plaintiffs argue the USFS failed to consider an important
aspect of the problem because it only analyzed the effects related to the 2018
Grizzly Bear Amendments, and not how the removal of the Wildlife Standards
may affect connectivity, security, and grizzly bear recovery. Federal Defendants
argue the USFS sufficiently analyzed how the 2021 Land Management Plan effects
grizzly bears as a whole. They reason that the agency did not specifically analyze
the how BiOp's removal of the Wildlife Standards may impact grizzly bears
because the agency was under no obligation to do so. Federal Defendants are
correct.

The parties agree that the Plan incorporates components of the 2018 Grizzly
Bear Amendments. *See* FS-00227990 (2021 Land Management Plan); FS-
00228707 (EIS). The effects of the retained 2018 Grizzly Bear Amendments
included: (1) decreased risk of bears becoming food-conditioned as a result of
requirements for food storage orders, FS-00228707; (2) maintaining or increasing

21

the amount of secure habitat through limits on motorized access, FS-00228708; (3) limiting potential effects of motorized routes associated with vegetation management, FS-00228709, and retaining forage and cover in grizzly bear habitat, FS-00228710; (4) limiting the potential for mortality related to developed recreation sites, FS-00228710; and (5) reduced risk of grizzly bear human conflict associated with livestock grazing, FS-00228710, and with oil and gas exploration and development, FS-00228710–11. The Record of Decision for the EIS indicates that the 2018 Grizzly Bear Amendments have "been incorporated in the final plan and will be used to direct the Forest to maintain on-the-ground habitat conditions that have contributed to and will sustain recovery." FS-00230789.

Plaintiffs argue, and the record reflects, that the Wildlife Standards may provide some benefit for grizzly bears by protecting habitat security, limiting open road density, and protecting forest cover. For example, in a 2013 biological assessment for "grizzly bears on the westside of the Helena National Forest," FS-104276–321, the USFS concluded that "[s]tandards that are directed at maintaining or improving seasonal habitat or security areas for big game species (e.g., elk) would indirectly benefit grizzly bears by improving security and potentially improving the forage base for grizzly bears." FS-00104298. However, while Plaintiffs persuasively isolate the Wildlife Standards as a key difference between the old and the revised Plans, they fail to show that the USFS was required to

22

explicitly analyze that change to meet its obligations under NEPA. There are over 200 goals, standards, objectives, and guidelines in the 1986 Plan, and numerous more in the 1986 Lewis and Clark National Forest Plan. It is not feasible to expect the USFS to discuss the specific effects each change may have under the revised Plan. Nor does NEPA require such analysis. Rather, NEPA "requires agencies to take a 'hard look' at the environmental consequences of their actions by preparing an EIS . . . [that] provide[s] [a] full and fair discussion of significant environmental impacts." *The Lands Council v. McNair*, 537 F.3d 981, 1000–01 (9th Cir. 2008). Because the USFS met that obligation here, its failure to discuss the direct, indirect, and cumulative effects of removing Wildlife Standards is not arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### B.    Alternatives (Claim 3)

NEPA requires that an EIS "present . . . the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment and the environmental consequences." 40 C.F.R. § 1502.14 (internal citations omitted). The EIS must "describe and analyze every reasonable alternative within the range dictated by the nature and scope of the proposal." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022) (discussing 40 C.F.R § 1502.14) (internal quotation marks omitted). "But an EIS need not consider an infinite range of alternatives, only reasonable or feasible

ones." *Id.* (internal quotation marks omitted). "[T]he rule of reason guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *Id.* at 989 (internal quotation marks omitted). The determination of reasonableness is driven by the stated goal of a project as defined in the EIS's "Purpose and Need" section. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

Plaintiffs concede that they may not demand the USFS consider specific alternatives, but they argue the range the USFS considered was not reasonable because all but the "no action" alternative omitted the Wildlife Standards. Federal Defendants counter that their approach was reasonable given the purpose and needs identified by the USFS in the EIS and the best available science on big game management. Federal Defendants are correct.

In the Purposes and Needs section of the EIS, the USFS states the "requirements of the 2012 Planning Rule, findings from the assessment, changes in conditions and demands since the 1986 Forest Plans, and public concerns highlighted several areas where changes are needed to the current plan." FS-00228316. In furtherance of these needs, the USFS developed a no action alternative (Alternative A), which maintained the Wildlife Standards, and five action alternatives (Alternatives B through F), which all removed Wildlife

24

Standards.  *See* FS-00228371–76.  The USFS chose action Alternative F as the preferred alternative.  FS-228375–76.

Plaintiffs' argument rests on the idea that all or some of the Wildlife Standards needed to be included in a considered alternative besides the no action alternative.  Plaintiffs do correctly note that the USFS has previously considered alternatives that retained some standards, FS-00201134 (withdrawing a big game forest plan amendment due to a lawsuit filed by in this Court challenging that amendment), but that does not mean the USFS was required to consider them here.  After all, the agency is only required to consider alternatives that are "reasonable," and besides arguing that they wanted the Wildlife Standards to remain, Plaintiffs fail to demonstrate that the proposed alternatives are otherwise unreasonable.  *Audubon Soc'y of Portland*, 40 F.4th at 981.

Plaintiffs also argue that the best available science does not support the removal of the Wildlife Standards because no published study or paper explicitly suggests that the Wildlife Standards' cover and road density guidance conflicts with the best available science.  In the EIS, the USFS discusses the best available science for elk within the Forest and concludes that "[m]ost research and recommendations regarding elk security, hiding cover, and managing elk vulnerability during hunting season cautions against applying results and recommendations from any one area too broadly, and most scientists and managers

*recommend analysis specific to the site or area* that considers the many factors influencing elk vulnerability in a *given area*." FS-00228779 (emphasis added). This record evidence supports Federal Defendants' argument that the best available science cautions against forest-wide standards.

Ultimately, Plaintiffs have not demonstrated that the USFS needed to develop an action alternative that included the Wildlife Standards, nor have they demonstrated that the USFS ignored the best available science. Thus, Plaintiffs have not established that the USFS failed to consider reasonable alternatives as required by NEPA.

## III.   Motion to Strike

Federal Defendants move to strike all of Plaintiffs' Declaration of David J. Mattson ("Mattson Declaration") and paragraphs 20, 23–26,[2] 29, and 32–38 of Plaintiffs' Declaration of Gayle Joslin ("Joslin Declaration"). (*See* Doc. 20 (referencing Docs. 18-1 and 18-2).) The Mattson and Joslin declarations are two of Plaintiffs' seven submitted declarations in support of their motion for summary judgment. (*Id.*) Federal Defendants argue that the declarations violate settled case law for admitting extra-record evidence into administrative cases, do not meet any of the narrow exceptions for extra-record evidence, and are an attempt to inject

---

[2] The Joslin Declaration has two paragraphs numbered paragraph 25; both are included in Federal Defendants' preferred paragraph range to be struck.

inadmissible expert testimony into the administrative record.  In response,

Plaintiffs argue that the declarations are properly used to support their standing

claims and their requested relief, partial vacatur.  Ultimately, Federal Defendants

have the better argument.

"Judicial review of an agency decision typically focuses on the

administrative record in existence at the time of the decision and does not

encompass any part of the record that is made initially in the reviewing court." *Sw.*

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.

1996).  The Ninth Circuit has acknowledged a limited set of exceptions under

which district courts are permitted to admit extra-record evidence. *See Lands*

*Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (noting that extra-record

evidence is allowed under certain circumstances, e.g., to explain technical terms or

complex subject matter).  But these exceptions do not allow extra-record evidence

to support Plaintiffs' merits arguments. *Rybachek v. U.S. EPA*, 904 F.2d 1276,

1296 n.25 (9th Cir. 1990).  However, extra-record declarations are allowed to

support Plaintiffs' standing arguments, *see Lujan v. Defenders of Wildlife*, 504

U.S. 555, 563 (1992), and Plaintiffs' argument regarding their requested relief, *see*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 797 (9th Cir.

2005).  The parties do not dispute that extra-record declarations may be allowed

for these enumerated purposes.  Rather, the defugalty is whether the Mattson

Declaration and the Joslin Declaration are actually being presented for those

permitted purposes. Because they are not, Federal Defendants' motion should be

granted.

Dr. Mattson is a scientist, professor, and world-renowned grizzly bear

expert. (Doc. 18-1 at ¶¶ 1–4.) He has spent his career, among other things,

working as a wildlife biologist for the United States Geological Survey and

teaching at both the Massachusetts Institute of Technology and Yale University.

(*Id.* at ¶ 2.) There is no dispute that as an expert, he is qualified. Dr. Mattson

explains the many ways he believes that, in his expert opinion, the USFS' decision

not to include Wildlife Standards into the 2021 Land Management Plan was

incorrect. He discusses how the Wildlife Standards, specifically the hiding and

thermal cover standards and the open-road density restrictions, are beneficial to

grizzly bears. (*Id.* at ¶ 55.) He also recommends keeping these standards because

doing so would help "achieve meaningful recovery of grizzly bears in the

contiguous United States." (*Id.* at ¶ 43.) Gayle Joslin is also a retired wildlife

biologist who worked predominately for Montana Fish, Wildlife, and Parks and is

a founding member of Plaintiff Helena Hunters and Anglers. (Doc. 18-2 at ¶¶ 5–

7.) In the paragraphs Federal Defendants request be struck, Joslin, like Dr.

Mattson, explains how she disagrees with the USFS's determination on these

matters.

The Mattson and Joslin Declarations both exceed the bounds of permissible extra-record evidence. They neither support Plaintiffs' standing arguments, *see Lujan*, 504 U.S. at 563, nor Plaintiffs' argument regarding their requested relief, *see Nat'l Wildlife Fed'n*, 422 F.3d 797. Rather, they discuss and implicate the merits of the matter. Therefore, Federal Defendants' motion is granted.

### CONCLUSION

For the reasons outlined above, IT IS ORDERED that Plaintiffs' motion for summary judgment (Doc. 17) is DENIED and Federal Defendants' motion for summary judgment (Doc. 22) and motion to strike (Doc. 20) are GRANTED.

DATED this _____ day of October, 2023.

10:45 A.M.

_____
Donald W. Molloy, District Judge
United States District Court